## IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2014-CA-00614-COA

| | |
|---|---|
| **SHELIDA MCKINNEY** | **APPELLANT** |

**v.**

| | |
|---|---|
| **HAROLD MCKINNEY AND KIM MCKINNEY** | **APPELLEES** |

DATE OF JUDGMENT:         01/15/2014
TRIAL JUDGE:         HON. TALMADGE D. LITTLEJOHN
COURT FROM WHICH APPEALED:         PRENTISS COUNTY CHANCERY COURT
ATTORNEY FOR APPELLANT:         DUNCAN L. LOT
ATTORNEY FOR APPELLEE:         GREG E. BEARD
NATURE OF THE CASE:         CIVIL - DOMESTIC RELATIONS
TRIAL COURT DISPOSITION:         GRANTED VISITATION TO APPELLEES
DISPOSITION:         AFFIRMED – 09/29/2015
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE IRVING, P.J., BARNES AND FAIR, JJ.**

**IRVING, P.J., FOR THE COURT:**

¶1.     Shelida McKinney appeals from the decision of the Prentiss County Chancery Court that granted Harold and Kim McKinney, the paternal grandparents of her minor children, visitation with the children. Shelida argues that the chancellor erred in granting visitation and in determining the extent of visitation.

¶2.     Finding no error, we affirm.

## FACTS

¶3.     Harold and Kim are the parents of Shelida's late husband, Jason McKinney, who died in an automobile accident on August 22, 2012. Jason is survived by Shelida and their three minor children: Kaylee, born on June 24, 2003; Zachary, born on April 10, 2005; and Kara,

born on July 23, 2009. On April 8, 2013, the grandparents filed a complaint against Shelida to establish reasonable grandparent-visitation rights under Mississippi Code Annotated section 93-16-3(1) (Rev. 2013). In Shelida's answer, she denied the grandparents' allegation that she had denied them reasonable visitation with their grandchildren since Jason's death and asked the chancery court to dismiss the complaint. However, pending a hearing on the grandparents' complaint, the parties agreed to a temporary order allowing the grandparents visitation on the first, third, and fifth Saturday of each month from 12:00 p.m. to 5:00 p.m., beginning August 17, 2013, and ending upon the chancery court's final determination of visitation.

¶4. When the matter was heard, Shelida testified that she had allowed the grandparents to visit with the children when there was no conflict with the children's schedule. She testified that Monday was often the best day to schedule a visit because the rest of the week was busy with after school activities, homework, and visits with friends. Shelida also testified that when Jason was alive, the grandparents were not very involved with the children, other than visits on special occasions and when she needed their help. Shelida agreed that "it was a good idea for the kids to have a relationship with the [grandparents]" but testified that the grandparents disrespected her authority as a parent. Shelida explained that, on one occasion, the grandparents brought the children home past the time she had asked for the children to be returned. She further explained that on a couple of occasions, while the children were with their grandparents, the children were allowed to go "with

2

[other] people without [her] permission . . . . [She did not] know where they [had gone]."

¶5.    Harold testified that, while Shelida allowed them to see their grandchildren, they were not allowed a "reasonable" amount of visitation. Harold further testified that, prior to Jason's death, they would see their grandchildren three or four times a week and that they all had a close relationship. Harold stated that he and Kim lived about two miles from Shelida and the grandchildren. He also stated that when they would attempt to visit after Jason's death, Shelida would turn them away because "[the children were] busy or doing something all the time.]" Harold further stated that he was willing to take the children to their Saturday activities if he and his wife were allowed visitation on that day. He could not recall ever interfering with Shelida's raising or disciplining of the children.

¶6.    Kim testified that if she and Harold were awarded visitation, the children's lives would not be disrupted. She stated that she had a place where the children could sleep if overnight visitation was granted. Kim acknowledged that she smoked, but stated that she would not do so in front of the children. Kim further testified that Shelida offered Monday afternoons for visitation with the grandchildren, but Kim did not get home from work until 6:00 p.m. on Mondays, making it difficult for her to see the children. She believed that Shelida purposefully asked for that day, knowing that Kim would not be there. Kim also testified that she once took care of her grandchildren for several days in a row when Shelida's job required her to be out of town. She agreed to respect Shelida's wishes regarding the disciplining of the children. Kim testified that Zach texted her until Shelida

3

took his phone away. Kim acknowledged that the church she and Harold attended was different from Shelida's church, but she pointed out that the churches were affiliated and provided the same message. Kim believed that it was in the best interest of the children for the children "to spend a few days with them each month" so that the children could spend some time with their cousins.

¶7. On cross-examination, Kim acknowledged that she had visited with the children after Jason's death. For example, she admitted taking Kaylee to a pumpkin patch and Kara to church twice. Kim also acknowledged the children's busy schedule and conceded that Monday was the day they did not have any school-related activities. Upon further cross-examination, Kim clarified—her contention was not that she and Harold were not getting to see their grandchildren following Jason's death but that the time with them was not quality time. Kim also stated that the relationship between her and Shelida had deteriorated since Jason's death but that they had "never had a cross word."

¶8. Several witnesses testified that the McKinneys were a tight-knit family. After the hearing, the chancery court granted visitation to the grandparents every Monday afternoon from 3:30 p.m. until 7:00 p.m.; the third weekend of every month from Saturday at 8:00 a.m. until Sunday 4:00 p.m.; and one week during the summer, beginning on Monday at 8:00 a.m. of the second week of July until the following Saturday at 8:00 p.m. The judgment also prohibited all parties from smoking in the presence of the children. Following the issuance of a supplemental order by the chancery court to clarify a transportation issue regarding the

grandparents' visitation, Shelida appealed.

## DISCUSSION

¶9. "Absent an abuse of discretion, this Court will not reverse the decision of the [chancery court]." *Solomon v. Solomon*, 980 So. 2d 319, 321 (¶2) (Miss. Ct. App. 2008) (citation omitted). "This Court will not disturb the factual findings of the [chancery court] unless [they] are manifestly wrong or clearly erroneous." *Id.*

¶10. Shelida admits that the grandparents had a statutory right to petition the chancery court for grandparent visitation, but she argues the chancery court erred in awarding visitation to the grandparents because she already was allowing them to visit their grandchildren. According to Shelida, the grandparents were required to show that she was unreasonably denying them visitation with their grandchildren, and without such a showing, the grandparents were not entitled to court-ordered visitation. She further argues that even if visitation was properly allowed, the scope of it should have been limited to the amount of visitation that the grandparents enjoyed prior to Jason's death. Understandably, the grandparents say that the chancery court did not err in any respect. We address these issues in turn.

> *1. Did the chancellor err in granting grandparent visitation?*

¶11. Mississippi Code Annotated section 93-16-3(1) (Rev. 2013) provides that "whenever one (1) of the parents of a minor child dies, either parent of the child's parents may petition the . . . chancery court in the county in which the child resides, and seek visitation rights with

5

the child." Section 93-16-3(2) provides:

> Any grandparent who is not authorized to petition for visitation rights pursuant to subsection (1) of this section may petition the chancery court and seek visitation rights with his or her grandchild, and the court may grant visitation rights to the grandparent, provided the court finds:
>
> > (a) That the grandparent of the child had established a viable relationship with the child and the parent or custodian of the child unreasonably denied the grandparent visitation rights with the child; and
> >
> > (b) That visitation rights of the grandparent with the child would be in the best interests of the child.

¶12. It is clear from even a casual reading of the statute that the statute recognizes two different categories of grandparents. The first category includes the grandparent of a minor child who has lost one of his or her parents, section 93-16-3, subsection (1), and the second category is a grandparent not described in subsection (1). In other words, the grandparent of a child who has both parents living falls under section 93-16-3, subsection (2). It is also clear from a reading of the statute that a grandparent falling under subsection (2) may petition a chancery court for visitation, and the visitation may be granted, provided the court finds that the grandparent meets the requirements of subsections (a) and (b) of section 93-16-3(2) – that is, the grandparent has established a viable relationship with the child, the parent or custodian of the child has unreasonably denied the grandparent visitation rights, and visitation would be in the best interests of the child.

¶13. What is not clear from a plain reading of the statute is what prerequisite or prerequisites must be met before visitation may be granted to a grandparent who petitions the

6

chancery court under section 93-16-3(1) for visitation. Here, it is clear that the grandparents fall in the first category of grandparents discussed above, because of the death of their son, Jason. So the question is: are the grandparents required, as Shelida argues, to show that they have been unreasonably denied visitation with their grandchildren when the subsection of the statute authorizing them to petition for visitation is silent as to the prerequisite(s) for granting visitation? The grandparents point out that the argument that Shelida makes here was made and rejected in *Zeman v. Stanford*, 789 So. 2d 798, 802 (¶15) (Miss. 2001). We agree. The chancery court did not err in finding that since the grandparents' petition for visitation was properly brought under section 93-16-3(1), the grandparents were not required to meet the requirements of section 93-16-3(2). This issue is without merit.

> 2. *Did the chancellor err in awarding the grandparents visitation greater than the amount of visitation enjoyed by the grandparents prior to Jason's death?*

¶14. Shelida next argues that even if visitation was warranted, the chancery court erred in granting the grandparents more visitation than they exercised prior to their son's death. She stresses that the grandchildren did not visit with their grandparents more than two or three times a week while Jason was alive, and she takes issue with the chancery court granting overnight visitation since the children had rarely spent the night at their grandparents' house during Jason's lifetime.

¶15. The Mississippi Supreme Court in *Settle v. Galloway*, 682 So. 2d 1032, 1035 (Miss. 1996) (internal citations omitted), in expressing concern over excessive grandparent

7

visitation, stated:

> Natural grandparents have no common-law "right" of visitation with their grandchildren. Such a right must come from a legislative enactment. Although the Mississippi Legislature created this right by enacting [section] 93-16-3, it is clear that natural grandparents do not have a right to visit their grandchildren that is as comprehensive as the rights of a parent.

¶16. For guidance, our supreme court has listed ten factors that should be considered in determining grandparent visitation. The factors are as follows:

> 1. The amount of disruption that extensive visitation will have on the child's life. This includes disruption of school activities, summer activities, as well as any disruption that might take place between the natural parent and the child as a result of the child being away from home for extensive lengths of time;
>
> 2. The suitability of the grandparents' home with respect to the amount of supervision received by the child;
>
> 3. The age of the child;
>
> 4. The age and physical and mental health of the grandparents;
>
> 5. The emotional ties between the grandparents and the grandchild;
>
> 6. The moral fitness of the grandparents;
>
> 7. The distance of the grandparents' home from the child's home;
>
> 8. Any undermining of the parent's general discipline of the child;
>
> 9. Employment of the grandparents and the responsibilities associated with that employment;
>
> 10. The willingness of the grandparents to accept that the rearing of the child is the responsibility of the parent, and that the parent's manner of child rearing is not to be interfered with by the grandparents.

*Martin v. Coop*, 693 So. 2d 912, 916 (Miss. 1997). In arriving at the decision to grant the

8

grandparents visitation, the chancery court considered the best interests of the minor children and each of the *Martin* factors and ultimately fashioned a visitation schedule that took into consideration the grandchildren's weekly schedule. And regarding the summer visitation, the court noted that it would grant visitation to the grandparents the second week in July so that Shelida would be able to celebrate the Fourth of July holiday with her children. We find nothing excessive about the amount of visitation ordered, and certainly nothing as comprehensive as would be awarded to a noncustodial parent. Therefore, we find no error in the decision of the chancery court. This issue is without merit.

¶17. **THE JUDGMENT OF THE CHANCERY COURT OF PRENTISS COUNTY IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, MAXWELL, FAIR, JAMES AND WILSON, JJ., CONCUR. CARLTON, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.**